PEOPLE v PERRY

Docket No. 97144. Submitted May 5, 1988, at Detroit. Decided November 7, 1988. Leave to appeal applied for.

James Perry was convicted of first-degree criminal sexual conduct, armed robbery, breaking and entering an occupied dwelling with intent to commit criminal sexual conduct, and possession of a firearm during the commission of a felony following a jury trial in the Recorder's Court for the City of Detroit, M. John Shamo, J. Defendant appealed alleging several errors.

The Court of Appeals *held:*

1. The trial court abused its discretion in allowing certain prior bad acts testimony to be admitted to prove identity. The admission of such evidence was not harmless error. The trial court abused its discretion in allowing defendant to be impeached by evidence of his prior convictions. Such error was not harmless. The defendant did not have to testify to preserve this issue for review.

2. There was sufficient evidence of personal injury to the victim to convict defendant of first-degree criminal sexual conduct.

3. There was insufficient evidence showing that the victim was physically helpless.

4. The victim's testimony was sufficient to allow a rational trier of fact to conclude that defendant was guilty of possession of a firearm during the commission of a felony.

5. The trial court improperly instructed the jury that crimi-

REFERENCES

Am Jur 2d, Evidence §§ 320 *et seq.*

Am Jur 2d, Rape § 8.

Am Jur 2d, Trial §§ 919-922.

Adequacy of defense counsel's representation of criminal client regarding prior convictions. 14 ALR4th 227.

Admissibility, in rape case, of evidence that accused raped or attempted to rape person othen prosecutrix. 2 ALR4th 330.

Remoteness in time of other similar offenses committed by accused as affecting admissibility of evidence thereof in prosecution for sex offenses. 88 ALR3d 8.

Admissibility, in prosecution for sexual offense, of evidence of other similar offenses. 77 ALR2d 841.

nal sexual conduct is a specific intent crime, however, no manifest injustice resulted. No manifest injustice resulted from the trial court's failure to specifically mention armed robbery as a specific intent crime because the instructions viewed as a whole properly stated the required intent. The trial court's instruction concerning the breaking and entering charge was sufficient.

Reversed and remanded.

Murphy, J., concurred in the result only.

H. R. Gage, J., concurred with the result but wrote separately to indicate her belief that the issue of impeachment by evidence of prior convictions was not preserved for appellate review due to defendant's failure to testify.

1. Criminal Law — Evidence — Similar Acts.

Evidence of a criminal defendant's similar criminal act may be admitted where (1) there is substantial evidence that the defendant actually perpetrated the similar act sought to be introduced; (2) some special quality or circumstance of the act tends to prove the defendant's identity, or the motive, intent, absence of mistake or accident, scheme, plan, or system in doing the act, or opportunity, preparation, or knowledge; (3) one or more of those factors is material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence substantially outweighs the danger of unfair prejudice (MRE 404[b]).

2. Criminal Law — Evidence — Similar Acts.

The manner and circumstances of the crime charged and the prior bad act sought to be introduced to prove identity must be so nearly identical as to earmark the charged offense as the handiwork of the accused before such prior bad act evidence may be introduced; both crimes must involve such distinctive, unique, peculiar or special circumstances as to justify a reasonable juror in inferring that they were the handiwork of the same person (MRE 404[b]).

3. Criminal Law — Criminal Sexual Conduct — Personal Injury.

"Personal injury" for purposes of the first-degree criminal sexual conduct statute means bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ (MCL 750.520a[j], 750.520b[1][g]; MSA 28.788[1][j], 28.788[2][1][g]).

4. Criminal Law — Criminal Sexual Conduct — Physically Helpless.

The term "physically helpless" for purposes of the criminal

sexual conduct statute means that a person is unconscious, asleep, or for any other reason is physically unable to communicate unwillingness to an act; the essence of physical helplessness is that the victim is unable to communicate unwillingness to an act (MCL 750.520a[i]; MSA 28.788[1][i]).

5. TRIAL — JURY INSTRUCTIONS — APPEAL — MANIFEST INJUSTICE.

Jury instructions are viewed as a whole on appeal to determine whether error requiring reversal occurred; reversal is not required absent manifest injustice where no objection was made to the instructions at trial.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of the Criminal Division, Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Richard B. Ginsberg*), for defendant on appeal.

Before: GILLIS, P.J., and MURPHY and H. R. GAGE,* JJ.

GILLIS, P.J. Following a jury trial, defendant was convicted of first-degree criminal sexual conduct, MCL 750.520b(1)(g); MSA 28.788(2)(1)(g), armed robbery, MCL 750.529; MSA 28.797, breaking and entering an occupied dwelling with intent to commit CSC, MCL 750.110; MSA 28.305, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant was sentenced to 75 to 150 years imprisonment for the CSC and armed robbery convictions and to ten to fifteen years imprisonment for the breaking and entering conviction. While these sentences ran concurrently with each other, they ran consecutively with defendant's mandatory two-year sen-

* Circuit judge, sitting on the Court of Appeals by assignment.

tence for the felony-firearm conviction. Defendant appeals as of right. We reverse.

At trial, the victim testified that defendant lived next door to her. On cross-examination, she admitted that defendant did not live next door to her, although his mother did. Defendant, however, did visit his mother. The victim had met defendant the previous summer. The victim denied defendant was her friend. The victim claimed that defendant came to her door on March 28, 1986, at 11:00 P.M. and knocked. The victim looked out, but did not answer the door or indicate that she was home. Defendant then left.

The victim fell asleep on the couch and was awakened at 3:05 A.M. when a sheet was placed over her head and she heard defendant say: "Nezzie, get up." The victim stated that she recognized defendant's voice because she had had ten conversations with him. On cross-examination, she was impeached by her preliminary examination testimony in which she stated that she had had only five conversations with defendant and she admitted that her conversations with defendant were short. The victim claimed that defendant's voice was deep. The victim, still groggy, stated: "Hum." Defendant stated: "Get your ass up." The victim stated: "All right." Defendant then pulled the victim up from the couch by her hand and tied his shirt around her eyes, under the sheet. On cross-examination, the victim admitted that defendant tied her boyfriend's T-shirt around her eyes. As defendant tied the T-shirt around her eyes, she saw his skin from the wrist down. The room was lit with a red light and the victim claimed that she recognized defendant's black skin. Defendant then removed the sheet.

The victim felt a steel circle behind her left ear and believed it to be the tip of a gun. Defendant

took her by the hand and told her to follow him. He led her to the bathroom and removed her gown, bra and panties. He told the victim to bend over. Defendant then placed his penis in the victim's vagina from behind. Defendant then told the victim to get down and struck her on the back of the neck with his arm. Defendant again vaginally penetrated the victim. On cross-examination, the victim also claimed that defendant attempted anal penetration.

Defendant then told the victim to get up and asked her if she had some money. The victim said she did not. Defendant placed the gun to her neck and told her not to lie. The victim told defendant that she had some money. He asked her where it was and she told him that it was in the living room on a stand. Defendant took the victim by the hand and told her that he did not see any money there. She told him to look in the white vase. The victim heard the money rattling.

Defendant then pushed the victim. The victim asked defendant if he was finished because the T-shirt was hurting her eyes. The victim heard defendant's footsteps in the kitchen and then heard the back door shut. The victim removed the shirt and ran to the back door, but did not see anyone.

The victim looked at the clock and stated that twenty minutes had passed from the time she woke up at 3:05 A.M. to the time defendant left at 3:25 A.M. The victim put on her clothes, gathered up the three children in the home and went to her boyfriend's house. The victim told her boyfriend that defendant had committed the crimes.

The victim called the police at 5:00 A.M. and stated that defendant was the culprit. The victim testified that she had locked her doors and her windows before she fell asleep. The police discov-

ered that the bars on the victim's basement window had been bent back.

The victim went to the hospital at 7:00 A.M. The victim claimed that her neck only hurt for a minute and that it did not bother her.

The victim further testified that a week before this incident occurred defendant had made a sexual remark to her in a store. The victim was impeached by her preliminary examination testimony that she had not spoken with defendant for two weeks before the incident.

The victim's boyfriend testified that he was at the victim's house and left between 11:00 P.M. and midnight. He did not see defendant. The victim came to his house at 4:00 A.M. and told him that defendant had raped her.

Because the trial court had granted the prosecutor's motion to introduce evidence of similar prior bad acts to prove identity, Miss B. was allowed to testify. She claimed that, in July or August of 1978 at between 3:30 and 4:00 A.M., defendant broke into her second-story apartment through a partially-opened window. Miss B. was awakened when defendant touched her on the shoulder and started shaking her. Defendant placed a knife to Miss B.'s throat and told her to do what he told her or else. Miss B. described defendant's voice as a deep male voice. Defendant asked Miss B. to remove her nightgown. Because she had her children sleeping in the same room, she went into another bedroom and told defendant that she would do what he wanted. Miss B., with defendant's help, removed her nightgown. Defendant told Miss B. that they were going to have intercourse. Miss B. told defendant that she had just gotten out of the hospital and could not have intercourse. He told her to turn over and had anal

intercourse with her. Defendant then made her perform fellatio on him.

Defendant then asked her if she had money or anything of value. She told him that she had money in a diaper bag and credit cards. Defendant and the victim went to the bathroom and turned on the lights. Defendant put a towel over Miss B.'s head so that he could look at her. As he was doing so, she saw defendant for one or two seconds. Defendant asked her if she saw him. She told him that she had not because she feared what he might do. Defendant told her that if he found out she was lying, he would come back and hurt her and the children.

Miss B. told defendant that she did not have anything of value. She gave him the money from the diaper bag and he took her credit cards and driver's license. Defendant told her not to call the police or she would be sorry. Defendant left at daybreak, approximately 5:30 A.M. Miss B. did not know defendant before the incident. We note that at the hearing concerning the admissibility of this prior bad act testimony there was evidence that defendant had also assaulted one of Miss B.'s children. This evidence was not introduced during trial on the instant charges.

Dr. William Taylor, II, testified that he examined the victim in this case at the hospital. Dr. Taylor noted tenderness in the back of the victim's neck. Dr. Taylor performed a urinalysis test, but his report indicated that a vaginal smear was not taken. Dr. Taylor noted that there was no trauma to the vaginal area. The victim told Dr. Taylor that she was raped by a friend.

After the prosecution rested, the trial court denied defendant's motion for a directed verdict.

Defendant's girlfriend testified that she left work, picked up their son and went to the home

where she lived with defendant. That home was apparently not close to the victim's home. Defendant's girlfriend arrived at the home at 6:00 P.M. and defendant was there. The trio went to the cleaners, the grocery store and to a delicatessen. At approximately 9:00 P.M., defendant dropped his girlfriend off at her mother's house and went home to put away the groceries and feed their child. At 11:15 P.M., defendant returned to his girlfriend's mother's house with his son and picked up his girlfriend. At 11:40 P.M., the trio arrived at their home. Defendant's girlfriend put their son to bed and she and defendant watched television until 1:30 A.M. The couple then went to bed. Defendant's girlfriend testified that she was a light sleeper and that defendant did not leave their home that night. At 6:23 A.M., defendant's brother called their home. Defendant's girlfriend woke him up so that he could talk to his brother. A telephone bill confirmed that a collect call was made at that time.

Defendant's brother testified that he made the telephone call and that, before he did so, the police had stopped by his mother's house and told her about the rape.

Defendant's mother testified that defendant had last been to her home two weeks prior to the date of the rape and that he was not at her house on the day of the rape. Defendant's mother claimed that the father of one of the victim's children went into the victim's home between 10:30 and 11:00 P.M.

We note that defendant did not testify because the trial court had earlier granted the prosecution's request to impeach him with the evidence of the convictions arising from the previous assault (i.e., criminal sexual conduct, breaking and enter-

ing with intent to commit larceny, and assault with intent to rob while armed).

We note that no fingerprints were taken at the scene and that no physical evidence was introduced which linked defendant to this crime. We further note that a police officer testified that defendant agreed to submit blood, saliva and hair samples and be fingerprinted.

During closing argument, the prosecutor argued that people like the victim in this case "don't get a fair shake in life." He added: "She deserves your consideration. She deserves consideration of her testimony." Defense counsel did not object to these comments.

Defense counsel did object when the prosecutor stated: "I believe [the victim] was telling the truth." Thereafter, the prosecutor conceded that it was for the jurors to determine the witnesses' credibility. The prosecutor further argued: "Put yourself on that stand and tell fourteen strangers that somebody" raped you while there were children in your house.

The prosecutor then argued:

> I'm going to ask you for one thing, though. I'm going to ask you for justice. I think justice is deserved in this case. I think the [using the victim's name] of this world demand consideration, demand justice. I think the victims of this world like [using the victim's name] demand fair consideration.

Defense counsel objected and the court asked the prosecutor to "stick to the facts." In closing, the prosecutor stated: "[T]ake all the evidence together and again I ask for justice."

The trial court properly instructed the jury that, before defendant could be convicted of armed rob-

bery, he had to have the intent to permanently deprive the victim of her property and that, before defendant could be convicted of breaking and entering with intent to commit CSC, he must have intended to commit the CSC at the time he broke and entered. After instructing the jury on felony-firearm, the trial court stated:

> Crimes charged in this case require proof of specific intent.
> Before the defendant can be convicted the defendant must have had more than the intent to do certain physical acts. He must have done the acts with a desire or knowledge that a certain unlawful result would occur. In this case he must have acted with a desire or knowledge to commit those acts. Such intent may be proven by the things the defendant said or did, the way he did them or any other facts or circumstances of the case. There can be no crime of criminal sexual conduct, B & E with the intent to commit criminal sexual conduct where there's no intent to commit those crimes and the burden rests upon the prosecution to show beyond a reasonable doubt that the defendant had that specific intent when he did the alleged acts.
> If from all the evidence you have a reasonable doubt as to whether or not the defendant acted with a specific intent to commit those crimes, then you must find the defendant not guilty of those crimes.

Defendant did not object to this instruction.

Defendant first claims that the trial court abused its discretion when it allowed the prior bad acts testimony to be admitted to prove identity. MRE 404(b). In *People v Golochowicz,* 413 Mich 298, 309; 319 NW2d 518 (1982), our Supreme Court held that before similar bad acts testimony may be introduced

(1) there must be substantial evidence that the

defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice.

In this case, identity was in issue and, because defendant had pled guilty to the prior offense, there was substantial evidence that defendant had actually perpetrated that act. Where the prior bad act testimony is introduced to prove identity, the manner and circumstances of the crimes must be so nearly identical as to earmark the charged offense as the handiwork of the accused. *Id.* at 310, quoting McCormick, Evidence (2d ed), § 190, p 449. In other words, it is not enough that the crime or crimes be the same or similar in title; instead both crimes must involve such distinctive, unique, peculiar or special characteristics as to justify a reasonable juror in inferring that they were the handiwork of the same person. *Id.* at 312. Our Supreme Court has noted that the distinguishing characteristics personalize the crime and thereby act as the defendant's signature. *Id.*

After a review of the above-described acts, we fail to see how these breaking and enterings, robberies and CSCs were signature crimes. See, e.g., *People v Goddard,* 429 Mich 505, 516, n 10; 418 NW2d 881 (1988); *Golochowicz, supra.* We reverse defendant's convictions because we cannot say that

the admission of this evidence was harmless beyond a reasonable doubt.

Applying the clarified balancing test announced in *People v Allen,* 429 Mich 558; 420 NW2d 499 (1988), we further agree with defendant that the trial court abused its discretion when it allowed him to be impeached by evidence of his prior convictions. As noted above, this error was not harmless. Moreover, we do not believe that defendant had to testify in order to preserve this issue for appeal. *People v Frey,* 168 Mich App 310; 424 NW2d 43 (1988). But see *People v Finley,* 161 Mich App 1; 410 NW2d 282 (1987), lv gtd 429 Mich 894 (1988).

Defendant next claims that there was insufficient evidence to convict him of csc under MCL 750.520b(1)(g); MSA 28.788(2)(1)(g), which provides:

> A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> *   *   *
>
> (g) The actor causes personal injury to the victim, and the actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

In ruling on such a claim, this Court views the evidence in the light most favorable to the prosecution and determines whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979), reh den 407 Mich 1164 (1980), cert den 449 US 885; 101 S Ct 239; 66 L Ed 2d 110 (1980).

Defendant claims that there was insufficient

proof of personal injury. The prosecutor claims that the victim's testimony that her neck hurt after defendant struck it and Dr. Taylor's testimony that the victim's neck was "tender" several hours after the assault were sufficient to constitute evidence of personal injury. MCL 750.520a(j); MSA 28.788(1)(j) defines personal injury as "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." We believe that the evidence presented, when viewed in the light most favorable to the prosecution, would allow a rational trier of fact to find that the victim had suffered a personal injury. See and compare *People v Swinford,* 150 Mich App 507, 511-513; 389 NW2d 462 (1986), lv den 426 Mich 861 (1986); *People v Mitchell,* 131 Mich App 69, 74; 345 NW2d 611 (1983); *People v Smith,* 128 Mich App 361, 366; 340 NW2d 855 (1983), lv den 418 Mich 918 (1984); *People v Jenkins,* 121 Mich App 195, 199; 328 NW2d 403 (1982); *People v Kiczenski,* 118 Mich App 341, 345; 324 NW2d 614 (1982), lv den 417 Mich 953 (1983); *People v Gwinn,* 111 Mich App 223, 239; 314 NW2d 562 (1981), lv den 417 Mich 949 (1983); *People v Thompson,* 76 Mich App 705, 710; 257 NW2d 268 (1977), lv den 402 Mich 829 (1977).

Defendant's claim that the term "personal injury" is unconstitutionally vague in that it confers unfettered discretion upon the jury to determine whether the offense has been committed is not preserved for appeal. *People v United States Currency,* 158 Mich App 126, 130; 404 NW2d 634 (1986); *Williams v City of Cadillac,* 148 Mich App 786, 790; 384 NW2d 792 (1985). In any event, given that personal injury is defined, we cannot say that the CSC statute vests unfettered discretion in the

trier of fact to determine whether a crime has been committed.

Defendant further claims that there was insufficient evidence that the victim was physically helpless. MCL 750.520a(i); MSA 28.788(1)(i) provides:

> "Physically helpless" means that a person is unconscious, asleep, or for any other reason is physically unable to communicate unwillingness to an act.

The prosecutor responds: "The testimony clearly showed that the victim was unconscious or asleep at the time of the attack." We cannot agree. While the victim was asleep when defendant entered the home, defendant woke her and then took her in the bathroom where the sexual assault occurred. We agree with defendant that the essence of physical helplessness is that the victim is unable to communicate unwillingness to an act. Such is the case when the victim is asleep or unconscious. Here, the victim was awake when the assault occurred and could physically communicate her unwillingness to the act. We note that a different result would follow if the victim had been penetrated by defendant while asleep or had awakened during that process. See, e.g., *People v Kusumoto,* 169 Cal App 3d 487; 215 Cal Rptr 347 (1985), discussed in *People v Patterson,* 428 Mich 502; 410 NW2d 733 (1987).

Defendant next claims that there was insufficient evidence to convict him of felony-firearm. Defendant argues that the victim's testimony that she felt what she believed to be the tip of a gun was insufficient to demonstrate that a firearm (i.e., a weapon from which a dangerous projectile may be propelled) was used in the commission of a felony. We believe that, given the legislative pur-

pose behind that statute, the victim's testimony, when viewed in the light most favorable to the prosecution, was sufficient to allow a rational trier of fact to conclude that defendant possessed a firearm during the commission of a felony. *People v Brooks,* 135 Mich App 193; 353 NW2d 118 (1984); *People v Abrom Hayden* and *People v Dickerson,* 132 Mich App 273, 295-296; 348 NW2d 672 (1984), lv den *People v Dickerson,* 422 Mich 881 (1985); *People v Schofield,* 124 Mich App 134; 333 NW2d 607 (1983), rev'd 417 Mich 988 (1983); *People v Pierce,* 119 Mich App 780; 327 NW2d 359 (1982); *People v Ray,* 119 Mich App 724, 729; 326 NW2d 622 (1982), lv den 419 Mich 867 (1984).

Defendant also claims that the above-quoted specific intent instruction given by the trial court requires reversal. Defendant contends that the trial court improperly instructed the jury that csc was a specific intent crime and failed to properly instruct the jury that armed robbery is a specific intent crime. Moreover, defendant claims that while the trial court did properly instruct the jury that breaking and entering with intent to commit csc was a specific intent crime, it failed to instruct the jury that the intent to commit csc was required to be shown before defendant could be convicted of that crime. Because defendant did not object to the instruction given, reversal is not required absent manifest injustice. *People v Kelly,* 423 Mich 261, 271-272; 378 NW2d 365 (1985). We note that instructions are viewed as a whole to determine whether error requiring reversal occurred. *People v McFarland,* 165 Mich App 779, 782; 419 NW2d 68 (1988). We agree with defendant that the trial court improperly instructed the jury that csc was a specific intent crime. *People v Pettway,* 94 Mich App 812, 817; 290 NW2d 77 (1980), lv den 411 Mich 1083 (1981). Nonetheless,

we hold that no manifest injustice resulted. *Kelly, supra.* Moreover, while we agree that the trial court should mention armed robbery in its specific intent instruction if one is given on retrial, we hold that no manifest injustice resulted from the trial court's failure to specifically mention armed robbery as a specific intent crime because the instructions viewed as a whole properly stated the required intent. See, e.g., *People v Yarborough,* 131 Mich App 579; 345 NW2d 650 (1983). Similarly, viewing the instructions as a whole, the trial court's instruction concerning the breaking and entering charge was sufficient. *Kelly, supra; McFarland, supra.*

Upon retrial of the remaining charges, the prosecutor should refrain from making the improper remarks quoted above. We need not address defendant's remaining issues.

Reversed and remanded for a new trial consistent with this opinion.

MURPHY, J., concurred in the result only.

H. R. GAGE, J. *(concurring).* I concur with the result reached by the majority but write separately regarding whether the defendant must testify to preserve the issue of impeachment by evidence of prior convictions. Prior panels of this Court have reached conflicting conclusions. Compare *People v Frey,* 168 Mich App 310; 424 NW2d 43 (1988); *People v Finley,* 161 Mich App 1; 410 NW2d 282 (1987), lv gtd 429 Mich 894 (1988). In *People v Allen,* 422 Mich 972 (1985), our Supreme Court granted leave to appeal and ordered that the parties brief the issue "whether the Supreme Court should adopt the rule . . . that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant

must testify." However, in deciding *Allen,* our Supreme Court failed to address the issue. *People v Allen,* 429 Mich 558; 420 NW2d 499 (1988).

In the absence of any clear direction from our Supreme Court, I would find persuasive the reasons advanced in *Luce v United States,* 469 US 38, 41-42; 105 S Ct 460; 83 L Ed 2d 443 (1984), for requiring the defendant to testify in order to preserve this issue:

> A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context. This is particularly true under Rule 609(a)(1), which directs the court to weigh the probative value of a prior conviction against the prejudicial effect to the defendant. To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify.
>
> Any possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. . . .
>
> When the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction. If, for example, the Government's case is strong, and the defendant is subject to impeachment by other means, a prosecutor might elect not to use an arguably inadmissible prior conviction.
>
> Because an accused's decision whether to testify "seldom turns on the resolution of one factor," . . . a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify. . . .
>
> Even if these difficulties could be surmounted, the reviewing court would still face the question of harmless error. . . . Requiring that a defendant

testify in order to preserve Rule 609(a) claims will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to "plant" reversible error in the event of conviction.

For these reasons, I would find that the issue of impeachment by evidence of prior convictions is not preserved for appellate review due to defendant's failure to testify.